**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

FILED

DEC 0 2 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| **GMAC REAL ESTATE, LLC,** | |
| Plaintiff, | |
| v. | |
| **REAL ESTATE BA, DAVID INKI CHUNG, KWUNG HO YANG,** and **HYUN CHUNG,** | |
| Defendants | |

05C 6817

JUDGE GOTTSCHALL

MAGISTRATE JUDGE VALDEZ

## COMPLAINT

Plaintiff, GMAC Real Estate, LLC ("GMACRE"), by its attorneys, as and for its Complaint against Defendants, Real Estate BA, David Inki Chung, Kwung Ho Yang, and Hyun Chung, alleges as follows:

### Nature of the Action

1.     This is an action for trademark infringement under the trademark laws of the United States, for unfair competition, and for breach of contract. GMACRE seeks, among other things, a preliminary and permanent injunction enjoining Defendants' wrongful and unlawful use of GMACRE's trademarks, service marks and trade names. GMACRE also seeks damages for Defendants' infringing and other wrongful conduct, as well as the attorneys' fees and costs it has incurred and will incur in prosecuting this action, as provided by statute and the parties' written agreements.

### Parties and Jurisdiction

2.     GMACRE is a limited liability company organized and existing under the laws of the State of Delaware having its principal place of business in the State of Illinois. GMACRE is engaged in the business of granting to others ("franchisees") the right to operate residential real

estate brokerage offices using various trade and service marks, including the mark "GMAC® Real Estate" (the "GMAC Marks").

3. GMAC Home Services, Inc. is the only member of GMACRE. GMAC Home Services, Inc. is a Delaware corporation having its principal place of business in the State of Illinois.

4. Upon information and belief, Real Estate BA is a California general partnership. David Inki Chung and Kwung Ho Yang are, or at all times relevant were, the sole members of Real Estate BA. Real Estate BA is a former franchisee of GMACRE.

5. Upon information and belief, Defendant David Inki Chung ("Chung") is a resident and citizen of the State of California.

6. Upon information and belief, Defendant Kwung Ho Yang ("Yang") is a resident and citizen of the State of California.

7. Upon information and belief, Defendant Hyun Chung is a resident and citizen of the State of California.

8. This Court has original subject matter jurisdiction of this action under 28 U.S.C. §§ 1331, 1338 and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy. This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1), in that this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial

district. Venue is also proper under the terms of the parties' Franchise Development Costs Note, which provides that "[a]ll litigation with respect to th[e] note or with respect to actions taken pursuant to th[e] Note shall be conducted in the Courts located in the State of Illinois."

### The GMAC Marks

10. GMACRE and its predecessors have developed, and GMACRE is the sole and exclusive owner of a unique and uniform system (the "GMACRE System") relating to the establishment and operation of residential real estate brokerage offices.

11. To identify the source, origin and sponsorship of GMAC real estate brokerages and the services they offer, and to distinguish those brokerages and services from those established, made, offered and sold by others, GMACRE and its predecessors and affiliates have extensively used certain trademarks, service marks, trade names, logos, emblems and indicia of origin, including but not limited to the name and mark "GMAC Real Estate" (the "GMAC Marks").

12. The mark "GMAC" is registered on the Principal Register of the United States Patent and Trademark Office. This registration continues in full force and effect.

13. GMACRE and its predecessors and affiliates have continuously used the GMAC Marks in interstate commerce in connection with the promotion, sale and franchising of real estate brokerages and the promotion and sale of the services they offer throughout the United States.

14. GMACRE has the exclusive right to use and license the GMAC Marks and derivations thereof in connection with the offer of residential real estate brokerage services to the public. Pursuant to written Franchise Agreements entered into by and between GMACRE and its authorized and approved franchisees, GMACRE grants franchises to qualified persons to own

and operate residential real estate brokerages using the GMAC Marks and the GMACRE System, but only in such manner and at such locations as are expressly authorized by GMACRE.

15.     GMACRE and its authorized franchisees use the GMAC Marks as the commercial marks and trade identity by which the advertisement, promotion and sale of real estate brokerage services offered by GMACRE and its authorized franchisees are distinguished from other similar and competitive business operations and the services they offer.

16.     GMACRE, its predecessors and affiliates and its authorized franchisees have extensively advertised and promoted residential real estate brokerages and the services they offer under the GMAC Marks throughout the United States and through various media.  As a result of such efforts and the considerable money spent in connection therewith, the services offered by GMACRE and its authorized franchisees under the GMAC Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States.

17.     By virtue of their continuous use by GMACRE and its authorized franchisees, the GMAC Marks have earned a secondary meaning in connection with the advertisement, promotion and sale of real estate brokerage services.

### The Parties' Written Franchise Agreement

18.     On or about July 31, 2003, GMACRE entered into a written GMAC Real Estate, LLC Real Estate Franchise Agreement (the "Franchise Agreement") with Real Estate BA pursuant to which GMACRE granted Real Estate BA a franchise to operate a residential real estate office at 4282 Wilshire Boulevard, #200, in Los Angeles, California.  Under the Franchise Agreement, Real Estate BA received, among other things, a limited license to use the GMAC

Marks. A true and correct copy of the Franchise Agreement is annexed hereto as Exhibit A and incorporated herein by reference.

19.     At the same time, Chung and Yang executed an Endorsement of Principals/Ownership Interest Holders ("Endorsement") by which they agreed to be personally bound by the provisions of Sections 3, 4, 8, 13, 17 and 19.b of the Franchise Agreement. A true and correct copy of the Endorsement is annexed hereto as Exhibit B and incorporated herein by reference.

20.     Under Section 3 of the Franchise Agreement, Real Estate BA agreed: (i) that its license to use the GMAC Marks was "derived solely from [the Franchise Agreement] and [was] limited to the operation of a real estate brokerage business by" Real Estate BA "pursuant to and in compliance with" the Franchise Agreement; (ii) that the GMAC Marks would be used "only in conjunction with permanent real estate offices approved by GMAC Real Estate," and (iii) that any unauthorized use of the Marks would constitute an event of default "and an infringement of the rights of GMAC Real Estate in and to the Marks."

21.     Real Estate BA further agreed that upon termination of the Franchise Agreement it would, among other things: (i) discontinue use of all GMAC Marks; (ii) surrender to GMACRE all signs and documentation bearing the GMACRE Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials and the like; and (iii) take immediate steps to cancel all advertising which carries the GMAC Marks, including advertising in all telephone directories.

## The Franchise Development Costs Note

22.     On August 1, 2003, Real Estate BA executed a Franchise Development Costs Note (the "Note") in favor of GMACRE in the face amount of $50,000.00. A true and correct copy of the Note is annexed hereto as Exhibit C and incorporated herein by reference.

23.     The Note would be amortized, and forgiven, over the term of the Franchise Agreement, at an equal monthly rate, as long as Real Estate BA was not in default under the Franchise Agreement. In the event Real Estate BA defaulted under the Franchise Agreement, the unamortized amount of the Note would immediately become due and payable to GMACRE.

24.     Chung, Yang and Defendant Hyun Chung each executed a Personal Guaranty of Note by which they "unconditionally and continually guarantee[d] payment" of the Note, jointly and severally, together with all costs, including attorney's fees, incurred in connection with any efforts to collect on the Note or enforce the Personal Guarantees. (True and correct copies of these Personal Guarantees are annexed hereto collectively as Exhibit D and incorporated herein by reference.)

## Real Estate BA's Financial Obligations Under the Franchise Agreement

25.     Under the Franchise Agreement, Real Estate BA agreed, among other things, to pay GMACRE certain fees, including Franchise Fees and Advertising Fees. The Franchise and Advertising Fees, which are due and payable on a monthly basis, are calculated by multiplying a fixed fee ($150 in the case of Franchise Fees and $25 in the case of Advertising Fees) by the greater of (i) the number of agents or brokers licensed or associated with Real Estate BA, or (ii) 25, as fully set forth in the Franchise Agreement. Real Estate BA also agreed to pay GMACRE an annual Referral Office Fee.

26. Real Estate BA agreed that in the event collection action was necessary to recover monies due GMACRE, Real Estate BA would pay interest and GMACRE's costs of collection, including attorneys' fees and court costs.

**Real Estate BA's Breaches of and GMACRE's Termination of the Franchise Agreement**

27. By letter dated January 21, 2005, GMACRE advised Real Estate BA that it was in default of its obligations under the Franchise Agreement. These defaults included: (i) Real Estate BA's improper and unauthorized use of the GMAC Marks; and (ii) Real Estate BA's improper and unauthorized use of the d/b/a name "Real Estate Bank GMAC." Additionally, Real Estate BA had acquired and commenced operating a branch office in Temecula, California, despite the fact that GMACRE specifically advised Real Estate BA that it was not permitted to open that branch office. The January 21, 2005 letter advised Real Estate BA that if it failed to fully cure each of these defaults within 30 days of the date of the letter, its Franchise Agreement could be terminated.

28. Subsequently, on March 16, 2005, GMACRE sent Real Estate BA another Notice of Default. In addition to the three (3) defaults referenced in the January 21st letter, this Notice advised Real Estate BA that it was in default of its obligations: (i) to pay GMACRE Franchise and Advertising Fees from October 2004 through February 2005, in the amount of $35,229.34; and (ii) to submit the reports required by Section 11 of the Franchise Agreement. The March 16, 2005 letter again reminded Real Estate BA that if it failed to fully cure these defaults within 30 days, GMACRE would pursue all remedies available to it, including termination of the Franchise Agreement.

29. Real Estate BA did not cure all of the defaults referenced in the January 21, 2005 and March 16, 2005 letters.

30. Accordingly, on May 3, 2005, GMACRE sent Real Estate BA a Notice of Termination advising it that the Franchise Agreement was terminated. The May 3, 2005 Notice reminded Real Estate BA of its post-termination obligations under the Franchise Agreement, including its obligation to cease all use of the GMAC Marks. The May 3, 2005 Notice also advised Real Estate BA that it owed GMACRE, among other things, the Transaction, Advertising and Referral Fees it had failed to pay.

## Defendants' Infringement of the GMAC Marks

31. Real Estate BA, Chung and Yang did not comply with the post-termination obligation set forth in the Franchise Agreement.

32. Among other things, Real Estate BA continues to use the GMAC Marks in connection with the operation of its real estate brokerage, to market and promote that brokerage through the use of the GMAC Marks, to hold the brokerage out to the public as an authorized GMACRE real estate brokerage, and to pass-off the brokerage and the unapproved services offered by the brokerage as being authorized by GMACRE when they are not.

33. Real Estate BA's use of the GMAC Marks is without the license or consent of GMACRE and has caused or is likely to cause mistake, confusion or deception in the minds of the public as to source, affiliation and sponsorship.

34. In addition to the fact that both GMACRE and Real Estate BA offer the identical services at their brokerages, the services provided by Real Estate BA using the GMAC Marks are offered to the same class of consumers as those who patronize authorized GMACRE brokerages. Upon seeing the familiar GMAC Marks through Real Estate BA's unauthorized use thereof, consumers will be deceived into concluding that Real Estate BA's brokerage, and the services offered and sold in connection therewith, are subject to GMACRE's supervision, are sponsored

or endorsed by GMACRE and bear the GMAC Marks pursuant to GMACRE's authority and permission.

35.    So long as Real Estate BA continues to use the GMAC Marks in connection with the operation of the brokerage, consumers have no practical way of knowing that Real Estate BA is no longer affiliated with, or sponsored, authorized or endorsed by, GMACRE. As a result, any consumer dissatisfaction with Real Estate BA's brokerage, or with the services offered in connection therewith, will be attributed to GMACRE and the entire GMACRE network.

36.    Real Estate BA has received actual notice of its violation and infringement of the GMAC Marks and has constructive notice of GMACRE's rights in the Marks and the registrations thereof pursuant to 15 U.S.C. § 1072. Real Estate BA's continued infringement is willful, malicious, fraudulent and deliberate.

## Defendants' Failure To Pay The Fees Due Under the Franchise Agreement

37.    Furthermore, Chung and Yang have failed to pay to GMACRE the monies due under the Franchise Agreement.

38.    Pursuant to the Franchise Agreement and the Endorsement, Chung and Yang agreed that upon termination of the Franchise Agreement they would, among other things, pay to GMACRE: (a) all fees, charges and other amounts due GMACRE, together with all Franchise Fees and Advertising Fees attributable to transactions in process on the termination date; and (b) referral fees on referrals sent or received prior to the termination date. The Franchise Agreement and the Endorsement also obligated Chung and Yang to pay to GMACRE "all financial losses sustained by GMAC Real Estate as the result of the early termination" of the Franchise Agreement for the one-year period following the date of termination of that agreement.

39.     Chung and Yang have failed and refused to pay these amounts to GMACRE. The sum of $88,383.34 remains due and owing to GMACRE.

40.     Additionally, Chung, Yang and Hyun Chung have failed to pay to GMACRE the unamortized portion of the Franchise Development Costs Note, in the amount of $45,416.76.

41.     GMACRE has fully performed its obligations under the Franchise Agreement.

**COUNT I**
**LANHAM ACT – TRADEMARK INFRINGEMENT**
**(Against Real Estate BA, Chung and Yang)**

42.     GMACRE realleges and incorporates by reference paragraphs 1 through 41 of its Complaint, inclusive, as and for this Paragraph 42, as if fully set forth herein.

43.     Defendants' acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the GMAC Marks, and Defendants' sale, offering for sale, distribution or advertising of goods and services under the GMAC Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(1).

44.     Defendants have actual notice of their violation and infringement of the GMAC Marks and had notice of GMACRE's rights in the GMAC Marks and the registrations thereof pursuant to 15 U.S.C. § 1072, and their infringement is willful and deliberate.

45.     The GMAC Marks are unique and represent to the public GMACRE and its affiliates' identity, reputation, and goodwill, such that damages alone cannot fully compensate GMACRE for Defendants' misconduct.

46.     As a direct and proximate result of Defendants' infringement, GMACRE has been substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

47. Unless enjoined by the Court, Defendants will continue to use and infringe the GMAC Marks, to GMACRE's irreparable injury. This threat of future injury to GMACRE's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the GMAC Marks and to ameliorate and mitigate GMACRE's injury.

**COUNT II**
**LANHAM ACT - UNFAIR COMPETITION**
**(Against Real Estate BA, Chung and Yang)**

48. GMACRE realleges and incorporates by reference paragraphs 1 through 41 of its Complaint, inclusive, as and for this Paragraph 48, as if fully set forth herein.

49. Defendants' acts, practices, and conduct constitute unfair competition, false designation of origin, and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C § 1125(a).

50. The GMAC Marks are unique and represent to the public GMACRE and its affiliates' identity, reputation, and goodwill, such that damages alone cannot fully compensate GMACRE for Defendants' misconduct.

51. As a direct and proximate result of Defendants' unfair competition, GMACRE has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

52. Unless enjoined by the Court, Defendants will continue to use and infringe the GMAC Marks, to GMACRE's irreparable injury. This threat of future injury to GMACRE's

business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the GMAC Marks and to ameliorate and mitigate GMACRE's injury.

## COUNT III
## BREACH OF CONTRACT – Post-Termination Obligations
### (against Real Estate BA, Chung and Yang)

53.     GMACRE realleges and incorporates by reference paragraphs 1 through 41 of its Complaint, inclusive, as and for this Paragraph 53, as if fully set forth herein.

54.     Defendants have failed and refused to perform their post-termination obligations under the Franchise Agreement and the Endorsement, including their obligations (i) to discontinue use of all GMAC Marks, (ii) surrender to GMACRE all signs and documentation bearing the GMACRE Marks, and (iii) take immediate steps to cancel all advertising which carries the GMAC Marks.

55.     Unless ordered by the Court to perform their post-termination obligations under the Franchise Agreement and the Endorsement, Defendants will continue to breach their post-termination obligations.

56.     Unless Defendants are ordered to perform their post-termination obligations under the Franchise Agreement and the Endorsement, GMACRE is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill, for which GMACRE has no adequate remedy at law.

57.     This threat of future injury to GMACRE's business identity, goodwill, and reputation requires that Defendants be ordered to perform their post-termination obligations under the Franchise Agreement and the Endorsement to prevent Defendants' continued breaches and to ameliorate and mitigate GMACRE's injury.

## COUNT IV
## BREACH OF CONTRACT – Damages
### (against Chung and Yang)

58.     GMACRE realleges and incorporates by reference paragraphs 1 through 41 of its Complaint, inclusive, as and for this Paragraph 58, as if fully set forth herein.

59.     Chung and Yang have breached the Franchise Agreement by, among other things, failing and refusing to pay Franchise Fees, Advertising Fees and Referral Fees to GMACRE.

60.     As a direct and proximate result of Chung's and Yang's breaches of the Franchise Agreement and the Endorsement, GMACRE has suffered damages in an amount in excess of $75,000.00, including, among other things, unpaid Franchise, Advertising and Referral Fees and the loss of the Franchise, Advertising and Referral Fees GMACRE would have earned for the 12 months following the termination of the Franchise Agreement.

## COUNT V
## BREACH OF GUARANTY
### (against Chung, Yang and Hyun Chung)

61.     GMACRE realleges and incorporates by reference paragraphs 1 through 41 of its Complaint, inclusive, as and for this Paragraph 61, as if fully set forth herein.

62.     Chung, Yang and Hyun Chung have breached their Guarantees by failing to pay to GMACRE the unamortized portion of the Franchise Development Costs Note.

63.     As a direct and proximate result of these breaches, GMACRE has suffered damages in the amount of $45,416.67, plus interest thereon.


**WHEREFORE**, GMAC Real Estate, LLC requests that judgment be entered in its favor and against Defendants Real Estate BA, Inc., David Inki Chung, Kwung Ho Yang, and Hyun Chung, as follows:

A. A preliminary and permanent injunction enjoining Real Estate BA, David Inki Chung and Kwung Ho Yang, their agents, servants and employees, and those people in active concert or participation with them, from:

   1. Using the GMAC Marks or any trademark, service mark, logo or trade name that is confusingly similar to the GMAC Marks;

   2. Otherwise infringing the GMAC Marks or using any similar designation, alone or in combination with any other components;

   3. Passing off any of their products or services as those of GMACRE or its authorized franchisees;

   4. Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of their business, products or services;

   5. Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with GMACRE and its franchisees or any of GMACRE's products or services; and

   6. Unfairly competing with GMACRE or its franchisees in any manner;

B. An Order directing Defendants Real Estate BA, David Inki Chung and Kwung Ho Yang to immediately perform their post-termination obligations under the Franchise Agreement and the Endorsement, including, without limitation, their obligations: (i) to surrender to GMACRE all signs and documentation bearing the GMACRE Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials and the like; and (iii) to take immediate steps to cancel all advertising which carries the GMAC Marks, including advertising in all telephone directories;

C. An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, wrappers, receptacles, uniforms, logo items, and advertisements in the possession of Defendants Real Estate BA, David Inki Chung and Kwung Ho Yang, their affiliates, subsidiaries, officers, agents, servants and employees, and those people in active concert or participation with them, bearing the GMAC Marks, and all plates, molds, and other means of making the same, if any, be delivered to GMACRE at Defendants' cost;

D. That Defendants Real Estate BA, David Inki Chung and Kwung Ho Yang be required promptly to eliminate their advertising under the GMAC Marks or any other confusingly similar designations from all media including, but not limited to, newspapers, flyers, coupons, promotions, signs, telephone books, telephone directory assistance listings and mass mailings, all at Defendants' cost;

E. That Defendants Real Estate BA, David Inki Chung and Kwung Ho Yang be required to file with the Court and to serve upon GMACRE's counsel within ten (10) days after entry of any injunction or order issued herein, a written report,

14

under oath, setting forth in detail the manner in which they have complied with such injunction or order;

F.      That Defendants David Inki Chung and Kwung Ho Yang account and pay over to GMACRE all gains, profits and advantages derived by them as a result of their infringement of the GMAC Marks, breach of contract and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

G.      That Defendants David Inki Chung and Kwung Ho Yang pay to GMACRE such damages as GMACRE has sustained by reason of said trademark infringement, breach of contract and unfair competition; and that, because of the willful nature of said infringement, the Court enter judgment for GMACRE for three times the amount of said damages, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

H.      On the Fourth Count of the Complaint, against Defendants David Inki Chung and Kwung Ho Yang, jointly and severally, in an amount to be proven at trial, but in excess of $75,000.00;

I.      On the Fifth Count of the Complaint, against Defendants David Inki Chung, Kwung Ho Yang and Hyun Chung, jointly and severally, in the amount of $45,416.67, plus interest thereon;

J.      An award of the costs and expenses, including reasonable attorneys' fees, incurred by GMACRE in connection with this action as provided for by statute and the parties' agreements; and

K.      Such other and further relief as the Court deems just and proper.

**GMAC REAL ESTATE, LLC**

By: _____

One of Its Attorneys

Norman M. Leon  *6239480 - AROC*
Catherine Burkhardt  *6215825 - AROC*
John Hughes  *6275159 - AROC*
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601
(312) 368-2192

# GMAC REAL ESTATE, LLC

## REAL ESTATE FRANCHISE AGREEMENT



## TABLE OF CONTENTS

Page

1.   THE FRANCHISE.................................................................................................1
2.   RELATIONSHIP OF THE PARTIES.................................................................1
3.   THE MARKS.......................................................................................................2
4.   MATERIALS........................................................................................................4
5.   TRAINING............................................................................................................4
6.   GRANT OF THE LICENSE................................................................................5
7.   CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC
     REAL ESTATE...................................................................................................6
8.   NO CONFLICTING LICENSE / INTEREST.....................................................6
9.   GROSS COMMISSION INCOME AND FEES / REAL PROPERTY...............7
10.  FEES...................................................................................................................7
11.  PAYMENT OF FEES/REPORTING.................................................................8
12.  LATE PAYMENT...............................................................................................9
13.  VERIFICATION RIGHTS.................................................................................10
14.  ADVERTISING FUND......................................................................................10
15.  REFERRALS......................................................................................................12
16.  PERFORMANCE STANDARDS.....................................................................12
17.  ASSIGNMENT AND OWNERSHIP; OWNERSHIP TRANSFER; RIGHT OF
     FIRST REFUSAL.............................................................................................13
18.  TERMINATION................................................................................................15
19.  OBLIGATIONS UPON TERMINATION.........................................................18
20.  REPRESENTATIONS AND WARRANTIES...................................................19
21.  ENTIRE AGREEMENT....................................................................................20
22.  INDEMNIFICATION AND INSURANCE.......................................................20
23.  CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY
     TRIAL; TIME LIMITATION FOR CLAIMS...................................................21
24.  MODIFICATION OF AGREEMENT................................................................22
25.  SEVERABILITY................................................................................................22
26.  NON-WAIVER...................................................................................................22
27.  NOTICES............................................................................................................22
28.  TERM AND RENEWAL...................................................................................22

i

29.    EFFECTIVE DATE.................................................................................................23

30.    LIMITATION OF DAMAGES. ...........................................................................23

## EXHIBITS

Endorsement of Principals / Ownership Interest Holders

A    -    Franchise / Advertising Fees

B    -    Franchise Development Costs Note

- 3/2003 Fran Agmt
CHGO1:30268504.v4 |

## REAL ESTATE FRANCHISE AGREEMENT

The parties, GMAC Real Estate, LLC, a Delaware limited liability company, with its principal offices at 2021 Spring Road, Suite 300, Oak Brook, Illinois 60523 ("**GMAC Real Estate**"); and

| | |
|---|---|
| David Inki Chung and Kwung Ho Yang, partners | dba Real Estate BA |
| Exact name under which real estate license is held ("**Strategic-Partner**"), whose principal place of business is located at 4282 Wilshire Blvd., #200, Los Angeles, CA 90010 FEDERAL ID# 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 | (any change in dba requires prior written approval) |

agree as follows:

## 1. THE FRANCHISE.

GMAC Real Estate and its predecessors have developed a franchise system (the "**Franchise**") which will permit use of the Marks (as defined in Section 3), including the Mark "GMAC Real Estate", in the promotion and sale of Real Property (as defined in Section 9.c.). The Franchise provides those firms selected to be strategic-partners with the opportunity to use the Marks and to participate in the other benefits outlined in this Agreement.

GMAC Real Estate: (a) provides guidelines regarding the use of the GMAC Real Estate name and other Marks, which are intended to maximize the value of the nationally recognized image of GMAC Real Estate and improve the effectiveness of Strategic-Partner's advertising, public relations, personnel recruiting and sales promotion programs; (b) facilitates referrals between strategic-partners (but excluding referrals from GMAC Real Estate's affiliated relocation company, unless Strategic-Partner and/or Strategic-Partner's sales associates have qualified for such referrals, and then, subject to the conditions of such qualification); (c) provides systems and programs to deliver sales training and education, management training and client promotional materials to its strategic-partners; and (d) periodically provides a national business conference for the benefit of its strategic-partners.

GMAC Real Estate will strive to improve the Franchise through development of new programs and review of existing programs and will seek recommendations from its strategic-partners to strengthen the Franchise at local and national levels.

## 2. RELATIONSHIP OF THE PARTIES.

GMAC Real Estate and Strategic-Partner are each independently owned and operated businesses which share similar mutual interests with respect to real estate brokerage. either this Real Estate Franchise Agreement (this "**Agreement**"), nor the use of the term "Strategic-

Partner" in this Agreement, is intended to create or shall be construed to create an agency, partnership, joint venture or employer-employee relationship between the parties. The GMAC Real Estate business operated by Strategic-Partner is an independently owned and operated business and Strategic-Partner is solely responsible for its day-to-day conduct and activities. Strategic-Partner is not an agent (actual, implied or ostensible) of GMAC Real Estate. Neither party shall hold itself out to be an agent, partner, joint venturer or employee of the other party. Neither party shall have the right to bind or obligate the other party.

Strategic-Partner agrees to conduct its real estate brokerage business: (a) in such fashion as to reflect favorably at all times on GMAC Real Estate and the good name, goodwill and reputation of GMAC Real Estate and the Marks, and (b) in compliance with all laws and regulations pertaining to the operation of its real estate brokerage business.

## 3. THE MARKS.

a. **Ownership and Modification of the Marks**. GMAC Real Estate is the owner or licensee of the GMAC Real Estate trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols used to identify the products and services offered by GMAC Real Estate franchises, including the mark "GMAC Real Estate" (collectively the **"Marks"**). The Marks may include certain logos owned by Meredith Corporation. Meredith Corporation has granted to GMAC Real Estate a license to use and to sublicense these logos. Strategic-Partner's right to use the Marks is derived solely from this Agreement and is limited to the operation of a real estate brokerage business by Strategic-Partner, pursuant to and in compliance with this Agreement and with all applicable standards, specifications and operating procedures prescribed by GMAC Real Estate, from time to time, during the term of this Agreement. Any unauthorized use of the Marks by Strategic-Partner shall constitute a Default (as defined in Section 18.d.) of this Agreement and an infringement of the rights of GMAC Real Estate in and to the Marks. GMAC Real Estate will protect and defend the Marks in the manner that it, in its sole discretion, determines is required. All goodwill resulting from Strategic-Partner's use and promotion of the Marks will accrue to the benefit of GMAC Real Estate.

If it becomes advisable at any time, in the sole discretion of GMAC Real Estate, to modify or discontinue use of any Mark and/or to require Strategic-Partner to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs, colors and other commercial symbols, Strategic-Partner agrees to comply with the requirements of GMAC Real Estate to modify or otherwise discontinue the use of such Mark and/or to use one or more additional or substitute trademarks, service marks, trade dress, logos, designs or other commercial symbols after notice to do so from GMAC Real Estate. All provisions of this Agreement applicable to the Marks shall apply to any other trademarks, service marks, trade dress, logos, designs, colors and commercial symbols later authorized by GMAC Real Estate, in writing, for use by and licensed to Strategic-Partner. The term "Marks" shall include any marks developed and/or registered in the future.

GMAC Real Estate shall have no obligation to reimburse Strategic-Partner for any expenditures made by Strategic-Partner to modify or discontinue the use of a Mark or to adopt additions to or substitutes for a discontinued Mark, including, without limitation, any expenditures relating to advertising or promotional materials or to compensate Strategic-Partner

for any goodwill related to the discontinued or modified Mark. Notwithstanding the foregoing, if GMAC Real Estate changes the primary service mark of the Franchise so that it no longer includes the words "GMAC Real Estate" or some variation of those words, GMAC Real Estate will (a) provide Strategic-Partner 12 months' prior written notice of the change and (b) allow Strategic-Partner to terminate this Agreement at the end of the twelve-month notice period. If Strategic-Partner elects to so terminate this Agreement, Strategic-Partner shall notify GMAC Real Estate, in writing, at least 90 days before the expiration of the 12-month notice period and shall comply with all post-termination obligations contained in this Agreement.

b.  **Use of Marks**.  To maintain the integrity of the Marks and the Franchise, GMAC Real Estate retains the right to control the quality of all materials and programs bearing the Marks and the manner in which the Marks are used.

The Marks shall be used: (1) only in conjunction with permanent real estate sales offices approved by GMAC Real Estate, and (2) only in the form and style authorized by GMAC Real Estate, as outlined from time to time in its manuals and other communications. Any departure from the restrictions set forth in the manuals or any use of the Marks on printed materials not outlined in the manuals must be approved in advance, in writing, by GMAC Real Estate. Use of the Marks on any publication (e.g., homeowner newsletter, decorating magazine, booklets, etc.) is specifically prohibited, unless the publication is approved in advance, in writing, by GMAC Real Estate.

Strategic-Partner will use the Marks in all real estate brokerage activities at or from the Licensed Site(s) (as described in Section 6) during the term of this Agreement.

The Marks shall not be used to identify any property, goods or services provided by Strategic-Partner, other than those specifically approved, in writing, by GMAC Real Estate. Strategic-Partner will not use the Marks in any manner which indicates or implies the endorsement by GMAC Real Estate of any real property listed, sold or advertised by Strategic-Partner, including such real property's design, quality or price.

Strategic-Partner shall not use the GMAC Real Estate name or any other Mark as part of its corporate or entity name or as part of an Internet (or other computer network) domain name or in any other manner not expressly authorized, in writing, by GMAC Real Estate. The Marks shall be used as part of the trade name of Strategic-Partner in connection with all of, and limited to, its real estate brokerage activities.

GMAC Real Estate reserves the right, in its sole discretion, to vary standards for any strategic-partner based upon the peculiarities or uniqueness of a strategic-partner's particular circumstances, business practices or any other conditions which GMAC Real Estate deems to require such variances. Strategic-Partner shall have no recourse against GMAC Real Estate for any variation from standard specifications and practices granted to any other strategic-partner and shall not be entitled to require GMAC Real Estate to grant Strategic-Partner a like or similar variation.

## 4.    MATERIALS.

The use of any GMAC Real Estate materials (including copyrighted materials) is restricted to use by Strategic-Partner in its own business. Strategic-Partner shall not use for its own benefit (except as provided in this Agreement) or license to, or otherwise permit, third-parties to use or reproduce, in any form or manner, GMAC Real Estate materials or programs, or adapt and use, or permit any of its sales associates or employees to adapt and use, any GMAC Real Estate materials or programs on an Internet (or other computer network) site or in any other manner without the prior written approval of GMAC Real Estate.

All building signs, yard signs, promotional items and printed materials shall adhere to the design, size, colors and other specifications (together, the "**Specifications**") set forth in the manuals or other communications supplied by GMAC Real Estate from time to time. No departure from the Specifications shall be permitted without the prior written approval of GMAC Real Estate which approval shall not be unreasonably withheld, denied or delayed; any such departure shall be considered a Default of this Agreement. Each of Strategic-Partner's Licensed Sites shall be required to display building signs in conformance with the Specifications within sixty (60) days of the Effective Date. If a zoning ordinance, regulation, lease or similar restriction precludes Strategic-Partner from using a sign consistent with the Specifications, prior to erection of an alternate sign, the details for such an alternate sign shall be presented for approval to GMAC Real Estate, with a copy of the relevant zoning ordinance, regulation, lease or similar restriction; GMAC Real Estate's approval shall not be unreasonably withheld, delayed or conditioned.

All business records, letterheads, business forms, advertising and other materials (excluding business cards) disseminated to the public and used in Strategic-Partner's business shall indicate Strategic-Partner's independent ownership of the brokerage business with the statement "An Independently Owned and Operated Firm".

GMAC Real Estate will provide the initial development of a new logo treatment for Strategic-Partner, together with a franchise opening/starter kit, including operating and presentation manuals, videotapes, audio tapes, advertising materials, magazines and marketing products, at no cost to Strategic-Partner.

**Strategic-Partner represents to GMAC Real Estate that the fictitious name it is utilizing has been accepted for filing by Los Angeles County. Strategic-Partner agrees that, should Los Angeles County or any other governmental authority at any point during the term of this agreement deem said fictitious name unacceptable, Strategic-Partner shall, at its sole cost, change the fictitious name as required by such governmental authority and replace all materials showing the old fictitious name.**

## 5.    TRAINING.

For New Strategic-Partners: GMAC Real Estate shall conduct a Getting Connected Session ("GCS") in the Chicago, Illinois area, or such other location designated by GMAC Real Estate. Strategic-Partner or its designated manager must attend, and satisfactorily complete, the first available GCS after execution of this Agreement. GMAC Real Estate will pay the GCS

registration fee for one attendee (either Strategic-Partner or its designated manager) to attend a GCS at the site selected by GMAC Real Estate, provided that such designated person attends the GCS within 12 months after the Effective Date. Strategic-Partner may elect to have additional persons attend a GCS, but it must pay the then-current GCS registration fee for each additional attendee.

For Renewing Strategic-Partners: Within six (6) months after renewal, Strategic-Partner shall send at least one key management representative to a GCS at a site designated by GMAC Real Estate. The representative must complete the GCS to GMAC Real Estate's reasonable satisfaction. Strategic-Partner must pay the GCS registration fee for its designated representative and for each additional attendee.

In addition, for both new and renewing Strategic-Partners, following the Effective Date and upon any subsequent changes in key management personnel, at least one key management representative per Licensed Site must satisfactorily complete "Management Boot Camp", a week-long management training class currently provided by a third-party vendor. Strategic-Partner must pay the Management Boot Camp registration fee for each attendee.

Strategic-Partner shall be responsible for all travel, living and other costs its attendees incur in association with attending these and all other training programs.

6. **GRANT OF THE LICENSE.**

a. **Current Offices.** Strategic-Partner represents that it presently operates offices, or will by the Effective Date operate offices, at the following location(s):

Location      4282 Wilshire Blvd., # 200, Los Angeles, CA 90010

GMAC Real Estate grants to Strategic-Partner a license to establish and/or operate real estate brokerage offices displaying the Marks at its existing office location or locations, as set forth above (the "**Licensed Site(s)**"). Although the license granted to Strategic-Partner is non-exclusive and similar licenses may be granted to others within Strategic-Partner's market area, GMAC Real Estate shall not grant to another strategic-partner a license to use the Marks at an office located at the Licensed Site(s).

Simultaneously with the execution of this Agreement, Strategic-Partner shall execute and deliver to GMAC Real Estate a written instrument, conveying to GMAC Real Estate Strategic-Partner's rights to any telephone numbers relating to the Licensed Site(s). GMAC Real Estate agrees that it will hold the instrument in escrow, and will not release the instrument or exercise its rights thereunder unless and until there exists an Event of Default under this Agreement.

b. **Additional Offices.** If Strategic-Partner desires to expand its Licensed Site(s), by opening an additional office or otherwise, it shall apply to GMAC Real Estate for approval to do so, by submitting a written application at least sixty (60) days prior to the planned date for opening. Approval of such expansion shall be within GMAC Real Estate's sole discretion and, if granted, shall be in writing. Strategic-Partner's application must be accompanied by payment of

the applicable New Office Fee in accordance with Section 10.e. If the office expansion is not approved by GMAC Real Estate, the New Office Fee will be refunded.

     c.    **Office Closures**. If Strategic-Partner wishes to close a Licensed Site, Strategic-Partner shall notify GMAC Real Estate, in writing, of such closing at least ninety (90) days prior to the date of the closing. If Strategic-Partner fails to give GMAC Real Estate such required prior notice, Strategic-Partner will be obligated to pay GMAC Real Estate, following such office closure, additional fees equal to the amount of all fees payable to GMAC Real Estate for the ninety (90) days preceding closure. GMAC Real Estate, within its sole discretion, may terminate such closed-office location as a Licensed Site.

     d.    **Sublicensing Prohibited**. Strategic-Partner shall not sublicense, or permit a third-party to use, the GMAC Real Estate name or any other Mark.

## 7.    CERTAIN ACTIVITIES NOT PRECLUDED; RIGHTS RESERVED BY GMAC REAL ESTATE.

Nothing in this Agreement shall preclude Strategic-Partner or other strategic-partners from listing, selling or advertising any real estate, wherever it or the owner of the real estate may be located, including in areas serviced by Strategic-Partner or other strategic-partners, as applicable. GMAC Real Estate reserves the right: (a) to license other real estate brokers to use the Marks anywhere, other than at Strategic-Partner's Licensed Site(s), including areas adjacent to, or in proximity with, the Licensed Site(s); (b) for GMAC Real Estate and its parents, subsidiaries, or affiliated entities to conduct activities, including real estate brokerage activities, mortgage, title insurance and relocation operations, in areas adjacent to, or in proximity with, the Licensed Site(s) under the Marks or other marks; and (c) for GMAC and its parents, subsidiaries, or affiliated entities to establish other franchises or company-owned outlets or other channels or distribution, selling or leasing similar products or services under a different mark. Additionally, GMAC Real Estate reserves the right to establish, and to have its parents, subsidiaries and/or affiliated entities establish, anywhere, franchises or company-owned businesses or other channels of distribution: (a) selling or leasing similar products or services under trademarks, service marks, trade dress, logos, designs, colors or other commercial symbols different from the Marks, or (b) offering dissimilar products or services under the Marks.

## 8.    NO CONFLICTING LICENSE / INTEREST.

During the period beginning on the Effective Date and ending on the last day of the Term, neither Strategic-Partner nor any of its principals or ownership interest holders (together, **"Owners"**), directly or indirectly, shall become affiliated with, establish or have an interest in: (a) any real estate brokerage franchising or similar system or service, other than one operated by GMAC Real Estate; or (b) any real estate brokerage operation or business or real estate information center, which is not licensed by GMAC Real Estate. The provisions of this Section 8: (y) shall remain in effect through the last day of the Term, even if Strategic-Partner attempts to voluntarily terminate this Agreement or ceases operations or if this Agreement is terminated as the result of an Event of Default attributable to Strategic-Partner; or (z) shall have no further effect if this Agreement is terminated as the result of a Event of Default attributable to GMAC Real Estate.

9.    **GROSS COMMISSION INCOME AND FEES / REAL PROPERTY.**

a.    Gross Commission Income, as defined below and where applicable, shall be used as the basis for the calculation of fees to be paid by Strategic-Partner to GMAC Real Estate.

b.    **"Gross Commission Income" ("GCI")** includes (A) all commissions and fees received by Strategic-Partner from the sale, lease, transfer or other disposition (including mergers and similar transactions) (each a **"Transfer"**) of Real Property (as defined below), including any note, obligation, lien or other consideration given to Strategic-Partner in lieu of a commission, less commissions and referral fees paid to cooperating and/or referring brokers in other brokerage entities, but excludes (B) all commissions and fees received by Strategic-Partner from property management, the Transfer of commercial real estate or the non-residential portion of farm properties and any other brokerage or similar activity, provided Strategic-Partner conducts such activities through a separate legal entity (with a Federal I.D. number different from Strategic-Partner's), which entity maintains its own office location and telephone number and does not use the Marks.  Specifically:  (X) GCI includes any selling bonuses, document preparation fees, administration and similar fees received by Strategic-Partner; (Y) GCI does not include referral payments made by GMAC Real Estate to Strategic-Partner; and (Z) there shall not be deducted from the calculation of GCI Strategic-Partner's expenses, membership or other fees (including multiple listing service fees) or payments made to brokers, sales associates or employees working in association with, or licensed through, Strategic-Partner.

c.    **"Real Property"** includes single and multiple unit residential housing, commercial properties, farm houses, vacant or unimproved land to be used for residential, recreation or commercial purposes, condominiums, cooperatives, townhouses, vacation houses, interests in interval-ownership/ time-share residential units and mobile homes when affixed to the ground.

10.    **FEES.**

Strategic-Partner agrees to pay the following fees (in United States dollars) to GMAC Real Estate:

a.    **Joining Fee.**  Simultaneously with the execution of this Agreement (if this Agreement is not being executed upon the expiration of a similar contract between Strategic-Partner and GMAC Real Estate or its predecessor), a Joining Fee in an amount equal to $20,000 for the first Licensed Site, plus $7,500 for each additional Licensed Site.  Notwithstanding the foregoing, if Strategic-Partner qualifies for the Classic Market Program (as described hereinafter), the Joining Fee will be $7,500, regardless of the number of sites.  For purposes of this Agreement, the "Classic Market Program" is a reduced-Joining Fee program open to strategic-partners that (i) earned $499,999 or less of GCI in the twelve (12) calendar months immediately preceding the Effective Date and (ii) are not located within any Metropolitan Statistical Area, as determined in accordance with the then-current standards of the United States Office of Management and Budget.

b.    **Franchise Fees.**  In accordance with the provisions of Exhibit A, attached.

c. **Referral Office Fee**. A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof), for each of Strategic-Partner's Licensed Sites (proportioned over a calendar year, if Strategic-Partner opens a new Licensed Site or closes a Licensed Site during such calendar year); provided, however, that Strategic-Partner shall be charged only one Referral Office Fee in any calendar year that its GCI is less than $500,000 (an overpayment by Strategic-Partner in one calendar year shall be credited to Strategic-Partner's account during the following calendar year). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

d. **Referral Fee**. A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

e. **New Office Fee**. A New Office Fee, in an amount equal to $7,500 per additional Licensed Site, due upon Strategic-Partner's request for GMAC Real Estate's approval of an office expansion pursuant to Section 6.b. above.

f. **Advertising Fee**. In accordance with the provisions of <u>Exhibit A</u>, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement.

g. **Business Conference Registration Fee.** Each attendee must pay the then-current registration fee.

## 11. PAYMENT OF FEES/REPORTING.

a. Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate; all fees shall be paid in United States dollars. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future.

b. GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an **"Affiliate"** of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system (**"BRS"**) approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system (**"EFT"**) approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all

c.     **Referral Office Fee**. A Referral Office Fee of $504 per year, billed in monthly installments of $42 per month (or $485 if paid in full, in advance, on the Effective Date and on each subsequent anniversary date thereof), for each of Strategic-Partner's Licensed Sites (proportioned over a calendar year, if Strategic-Partner opens a new Licensed Site or closes a Licensed Site during such calendar year); provided, however, that Strategic-Partner shall be charged only one Referral Office Fee in any calendar year that its GCI is less than $500,000 (an overpayment by Strategic-Partner in one calendar year shall be credited to Strategic-Partner's account during the following calendar year). Strategic-Partner acknowledges that payment of the Referral Office Fee is required to help defray the costs of promoting GMAC Real Estate's broker to broker referral network and that payment of the Referral Office Fee does not insure that Strategic-Partner will receive any such broker to broker referrals.

d.     **Referral Fee**. A referral fee, in accordance with Section 15 below, to GMAC Real Estate and, as applicable, any of its strategic-partners, within 10 days of the receipt by Strategic-Partner of a commission or fee generated from a transaction which was referred to Strategic-Partner by GMAC Real Estate or any of its strategic-partners.

e.     **New Office Fee**. A New Office Fee, in an amount equal to $7,500 per additional Licensed Site, due upon Strategic-Partner's request for GMAC Real Estate's approval of an office expansion pursuant to Section 6.b. above.

f.     **Advertising Fee**. In accordance with the provisions of Exhibit A, attached. Advertising Fees shall be used in connection with the Advertising Fund, described in Section 14 of this Agreement.

g.     **Business Conference Registration Fee.** Each attendee must pay the then-current registration fee.

## 11.   PAYMENT OF FEES/REPORTING.

a.     Strategic-Partner agrees to pay all fees as set forth above and on the appropriate Exhibit, and to use such forms or computer software as recommended by GMAC Real Estate; all fees shall be paid in United States dollars. Strategic-Partner agrees to furnish reports to GMAC Real Estate as the latter may reasonably require, including, but not limited to, periodic financial reports and statements, as provided in this Agreement and as may be reasonably requested by GMAC Real Estate in the future.

b.     GMAC Real Estate shall have the right to set-off any amounts due to Strategic-Partner (including Awards) against any amounts due from Strategic-Partner to GMAC Real Estate or to any Affiliate of GMAC Real Estate (an "**Affiliate**" of GMAC Real Estate is defined as an entity, the majority ownership of which is held, directly or through subsidiaries, by General Motors Acceptance Corporation). Within 90 days of receiving a notice, in writing, from GMAC Real Estate to do so, Strategic-Partner shall make all reports through a broker reporting system ("**BRS**") approved by GMAC Real Estate and shall make all payments to GMAC Real Estate, electronically, through an electronic funds transfer account/system ("**EFT**") approved by GMAC Real Estate, which may or may not use a BRS. After receipt of such written notice and within the above time period, Strategic-Partner shall install and use a BRS and/or EFT, including all

required hardware and software. Acceptable BRS's and EFT's will be those set forth on a document prepared and distributed by GMAC Real Estate to Strategic-Partner, together with (or prior to) the service of the written notice referenced above. As to each BRS and EFT (as applicable), Strategic-Partner shall (A) continuously maintain a software support system through an agreement with a reputable and competent service provider, (B) promptly cause to be rectified all problems which interfere with the proper operation of the BRS, (C) install updated versions as they become available, and (D) enter promptly (within 48 hours of settlement or closing, as to fees based on GCI or transactions) and accurately all information requested, including information related to listings, pendings, offices and agents. In addition, as to each EFT: (Y) Strategic-Partner shall enter into and keep effective whatever agreements with third-parties (including Strategic-Partner's financial institution) are required to permit GMAC Real Estate to withdraw electronically from Strategic-Partner's account amounts to which GMAC Real Estate is entitled and to provide in such agreements that 30-days prior notification will be given to GMAC Real Estate before such agreements are terminated, suspended or materially changed, and (Z) Strategic-Partner shall maintain sufficient monies in its accounts to cover all withdrawals permitted to be made by GMAC Real Estate.

c.      Strategic-Partner agrees to furnish to GMAC Real Estate, on an ongoing updated basis and in form as reasonably requested by GMAC Real Estate, a roster of sales agents, brokers and other persons associated with Strategic-Partner who are authorized and/or licensed to conduct real estate sales activities, which roster shall include, as to each such sales agent and broker, the name, address, real estate license number (with a copy of the license), date of association, date of termination, location of office from which each such sales agent and broker is operating and other items that may reasonably be requested by GMAC Real Estate, from time to time.

**12.    LATE PAYMENT.**

If Strategic-Partner fails to make payment of any fee within 15 days of its due date: (a) Strategic-Partner shall pay to GMAC Real Estate interest on the payment due at the annual rate of prime plus 4%, but, in any event, not less than 12% nor more than 15%; "**prime**" is defined as the interest rate published in The Wall Street Journal (the "**WSJ**") in its money rate section on the 1st business day of each month, as the prime or base lending rate being offered on that day (if such interest rate is not so published in the WSJ, "prime" shall be the average prime or base lending rate, as of that date, being offered by Citibank, N.A., to its most credit-worthy customers for 90-day loans); (b) GMAC Real Estate shall have the right, at its option, to deduct all such amounts from any payments due to Strategic-Partner pursuant to this Agreement or otherwise; (c) if the delinquent payment is in connection with a deferred payment plan, subject to any contrary provision in any documentation evidencing such a deferred payment plan, all present and future payments shall be automatically accelerated and all amounts due under the plan shall be considered due and payable; and (d) at the option of GMAC Real Estate and after written notice has been served upon Strategic-Partner, GMAC Real Estate may terminate Strategic-Partner's right to receive referrals, change any territorial provisions and/or, if Strategic-Partner's Fee Schedule is based solely on GCI, terminate Strategic-Partner's right to receive Awards (as defined in Exhibit A). In the event collection action is necessary to recover monies due to GMAC Real Estate, Strategic-Partner agrees to pay the costs of collection, including agency and attorneys fees and court costs.

## 13.    VERIFICATION RIGHTS.

No later than one hundred twenty (120) days following the end of each calendar-year during the Term (including any calendar-year in which the Term expires), Strategic-Partner shall provide to GMAC Real Estate annual financial statements in a form acceptable to GMAC Real Estate. If Strategic-Partner is conducting a business which is not covered by this Agreement, Strategic-Partner shall maintain a separate set of books and records for its real estate brokerage operations. Strategic-Partner shall permit a GMAC Real Estate representative to inspect and audit Strategic-Partner's accounting records and books for each line of business in which Strategic-Partner engages. If it is determined that Strategic-Partner has reported to GMAC Real Estate GCI which is 3% or more lower than GCI actually received by Strategic-Partner, Strategic-Partner shall pay to GMAC Real Estate, in addition to the unpaid fees, interest on the unpaid fees as provided in Section 12, plus the actual travel costs and expenses of the auditors and other persons involved in the inspection and/or audit. GMAC Real Estate shall have the right to inspect Strategic-Partner's offices and to confer with Strategic-Partner, its sales associates and employees to assure compliance with the standards GMAC Real Estate prescribes from time to time. GMAC Real Estate also shall have the right, and Strategic-Partner and each of its Owners hereby confirms that each of them so authorizes GMAC Real Estate to complete a credit investigation concerning each or all of them from time to time during the Term, as and in whatever manner GMAC Real Estate deems necessary in its sole discretion.

In addition, within the first ninety (90) days following the Effective Date of this agreement, as defined in Section 29 below, GMAC Real Estate may at its sole discretion audit Strategic-Partner in accordance with the terms outlined in the above paragraph.

## 14.    ADVERTISING FUND.

a.    Within its sole discretion, GMAC Real Estate (or an entity designated by GMAC Real Estate, in which event, such entity shall have all the rights and obligations of GMAC Real Estate with respect to the Advertising Fund, as provided in this Section) may establish and operate a fund (the **"Advertising Fund"** or the **"Fund"**) for the purpose of providing marketing and advertising relative to the Marks. The Advertising Fund shall consist of monies paid to GMAC Real Estate by entities using the Marks, including Strategic-Partner. The monies paid to GMAC Real Estate as Advertising Fees (or otherwise designated by GMAC Real Estate as monies to be used by the Advertising Fund) shall be used by GMAC Real Estate, within its sole discretion, to, among other things: (A) create, produce, administer and support (either in-house or outsourced) national, regional and local marketing, advertising, public relations, promotional and other programs (together, **"Programs"**); and (B) present and promote a national business conference.

b.    The amount, type, timing, content, location, cost and all other matters relating to Programs sponsored by the Advertising Fund or to which the Advertising Fund contributes, shall be within the sole discretion of GMAC Real Estate. Monies expended from the Advertising Fund on Programs in areas served by Strategic-Partner are not required to be proportionate to the amount of Advertising Fees paid by Strategic-Partner. Expenditures from the Advertising Fund shall be charged first to earned interest, if any.

c.      GMAC Real Estate, in any calendar year, may expend from the Advertising Fund amounts which are greater or lesser than either amounts received by the Advertising Fund in such year or amounts contained in the Advertising Fund during that year (regardless of when they were collected). If a lesser amount is expended, the balance shall be carried over to the next year; if a greater amount is expended, the excess amount shall be repaid to GMAC Real Estate (or to whomever provided such monies, if other than GMAC Real Estate) from fees received by the Advertising Fund in the next year.

d.      In the event a strategic-partner is delinquent in the payments required to be made by it to the Advertising Fund, GMAC Real Estate shall have the right (but not the obligation) to undertake collection action against the delinquent strategic-partner and to charge the reasonable costs of collection (including, but not limited to, collection agency fees, attorney's fees and costs) to the Advertising Fund. GMAC Real Estate, within its sole discretion, shall have the right to settle, reduce, compromise or waive payments required to be made by a strategic-partner to the Advertising Fund.

e.      Advertising Fees (and all other monies received by the Advertising Fund) shall be accounted for separately, but may be deposited and commingled with any other funds of GMAC Real Estate. On or before April 30 of each year, GMAC Real Estate shall prepare a financial statement of the Advertising Fund for the prior calendar year, which shall be certified by a senior officer of GMAC Real Estate and shall be forwarded to Strategic-Partner, upon Strategic-Partner's written request. Strategic-Partner shall have the right to reasonably review the books and records of the Advertising Fund at GMAC Real Estate's principal place of business, upon reasonable prior notice to GMAC Real Estate.

f.      GMAC Real Estate shall have the right, in its sole discretion, to negotiate with any strategic-partner a different arrangement than that set forth in the Section entitled "Advertising Fees", relating to the payment of Advertising Fees, including, but not limited to, payments by such strategic-partner for designated local marketing in lieu of the payment by such strategic-partner of Advertising Fees, or payments from the Advertising Fund to a strategic-partner for designated local marketing, where national or regional marketing is determined to be inappropriate or where other situations, peculiar to a local market, are determined by GMAC Real Estate, within its sole discretion, to require such action.

g.      GMAC Real Estate, within its sole discretion and upon 30-days notice to Strategic-Partner, may suspend or discontinue (and, thereafter, within its sole discretion, reinstate) the Advertising Fund, provided that, upon a suspension or discontinuance, the Fund shall continue to be operated until all monies in the Fund are expended in accordance with the provisions of this Agreement.

h.      GMAC Real Estate's obligations with respect to the Advertising Fund and the collection, maintenance and distribution of Advertising Fees are as set forth in, and limited to, those contained in the provisions of this Agreement. In no event shall GMAC Real Estate be deemed to have fiduciary obligations to Strategic-Partner as to the operations of the Advertising Fund.

## 15. REFERRALS.

a. **Broker to Broker Referrals**. With respect to a broker-to-broker referral to be made by Strategic-Partner, Strategic-Partner shall make each such referral to an eligible GMAC Real Estate strategic-partner or, if no such strategic-partner is located in the applicable area, then to another broker approved by GMAC Real Estate (hereinafter an "Authorized Alternative Broker"). All such referrals shall be made either by contacting GMAC Real Estate to have GMAC Real Estate facilitate the referral or by directly contacting such strategic-partner. The strategic-partner who places the referral must register the transaction with GMAC Real Estate. To register a referral, Strategic-Partner must submit the required referral form to include complete contact information as provided at the time that the referral is accepted by the destination broker. This referral form is required regardless of whether the destination broker is a strategic-partner of GMAC Real Estate or is an Authorized Alternative Broker. Strategic-Partner shall pay referral fees and royalties as set forth below.

If another GMAC Real Estate strategic-partner refers a transaction to Strategic-Partner, Strategic-Partner will, within 10 days after it receives any GCI from that referred transaction, pay to the referring strategic-partner a fee equal to 25% of the GCI that Strategic-Partner earned from the referred transaction.

Likewise, if Strategic-Partner refers a transaction to another strategic-partner or Authorized Alternative Broker, that other broker will pay to Strategic-Partner a fee equal to 25% of the GCI it earned from the referred transaction. In that instance, Strategic-Partner then will pay GMAC Real Estate a fee equal to 2.5% of the GCI that the other broker earned from the referred transaction (which may also be stated as 10% of the amount that Strategic-Partner received from the other broker).

b. In the event Strategic-Partner fails to comply with the above procedures or with the policies, standards or procedures adopted by GMAC Real Estate, from time to time, regarding referrals, GMAC Real Estate may, at its option (and in addition to any other remedies available to it for a Default of this Agreement), suspend further referrals to Strategic-Partner, remove Strategic-Partner from the authorized referral directory, require referral training attendance, terminate this Agreement or take other action deemed appropriate.

c. Strategic-Partner acknowledges that it acquires no rights or expectations with respect to referrals, whether from corporate relocation activities or otherwise, beyond those expressly stated in this Section.

## 16. PERFORMANCE STANDARDS.

a. Strategic-Partner agrees that retention of market coverage, consistent performance, recruitment and training of a full-time, professional sales staff and commitment to the programs of GMAC Real Estate are necessary for retention of the license granted by this Agreement. Strategic-Partner shall use Strategic-Partner's best efforts, and shall actively encourage its managers and sales agents, to implement third-party and affiliated programs sponsored by GMAC Real Estate, through its Strategic Alliance Group or otherwise.

b.      Strategic-Partner's performance shall be reviewed annually on the anniversary of the Effective Date. Strategic-Partner's average GCI shall exceed, for the 1 year period being reviewed, 75% of the higher of (a) GCI attained during the first year after the Effective Date (or, if the review period is for the first year after the Effective Date, the last year prior to the Effective Date), or (b) GCI attained during the 1-year period prior to the 1-year period being reviewed, or (c) the average of the prior 3 years (if Strategic-Partner has been licensed for such period). Failure by Strategic-Partner to meet this performance standard shall constitute an Event of Default under this Agreement. Notwithstanding the provisions of this subparagraph (b), if the Market Area (as later defined) serviced by Strategic-Partner is negatively impacted as a whole, to the extent that the total sales volume, by dollar, of residential property sold during the year being reviewed is less than 90% of the total sales volume, by dollar, of residential property sold during the prior year, the percentage of GCI to be maintained by Strategic-Partner shall be reduced proportionately (e.g., if the total sales volume of the year being reviewed is 90% of the total sales volume of the prior year, the percentage required to be maintained by Strategic-Partner shall be reduced by 10%, i.e., to 67.5% - 10% of 75%). **"Market Area"** shall be the area serviced by the following multiple listing service: CLAW (the **"MLS"**); total sales volume shall be as reflected by the records of the MLS.

## 17.     ASSIGNMENT AND OWNERSHIP; OWNERSHIP TRANSFER; RIGHT OF FIRST REFUSAL.

a.      **Assignment.** GMAC Real Estate shall have the right, within its sole discretion, to assign or transfer this Agreement and/or any of its rights or obligations under this Agreement to a third-party, whether or not such third-party is affiliated with GMAC Real Estate.

Strategic-Partner acknowledges and agrees that GMAC Real Estate has entered into this Agreement in reliance upon the qualifications and representations of Strategic-Partner and, where Strategic-Partner is an entity, upon the qualifications and representations of both Strategic-Partner and Strategic-Partner's Owners (as defined in Section 8). Strategic-Partner shall have the right to assign this Agreement, but only subject to the following conditions: (1) the assignment is in connection with the Transfer (as later defined) of the assets or ownership interest of Strategic-Partner to a third-party and the third-party has agreed, in writing, to honor Strategic-Partner's obligations under this Agreement and GMAC Real Estate has consented to such Transfer (which consent shall be in accordance with the provisions of subsection 17.c., below); (2) all of Strategic-Partner's obligations to GMAC Real Estate (financial and otherwise) have been satisfied; (3) agreement by the transferee (or a principal of the transferee) to attend a GCS; (4) a copy of the Transfer document is delivered to GMAC Real Estate; (5) at least 30-days prior written notice is given to GMAC Real Estate; and (6) the transferee executes a franchise agreement in the form as contained in the most recently filed offering circular, for the term indicated in that form (but not less than 5 years), commencing with the date of execution of the new agreement. Strategic-Partner shall remain liable to GMAC Real Estate pursuant to this Agreement with respect to all obligations which are based on actions or omissions prior to the effective date of the assignment.

b.      **Ownership.** Strategic-Partner certifies that: (i) Strategic-Partner is an individual or, if one of the entities described below is checked, it is that type of entity; and (ii) if Strategic-Partner is an entity, the Owners listed below are the only principals or persons holding an

ownership interest in Strategic-Partner and the percentage of ownership interest held by each is set forth next to the name of each such person (if an ownership interest is held by another entity, Strategic-Partner certifies that there is set forth below each successive ownership interest, until individual ownership interests are reached and disclosed). Strategic-Partner shall notify GMAC Real Estate, in writing, prior to any change in the ownership interests (or the percentages) shown below or any change in the broker of record (the name of whom is set forth below).

(__)    corporation: organized under the laws of the State or Commonwealth of _____

(__)    limited liability company: organized under the laws of the State or Commonwealth of _____

( X )    general partnership: organized under the laws of the State of California

Owners:

| David Inki Chung | 75% |
| Kwung Ho Yang | 25% |

(Ownership interest holders listed)

David Inki Chung
(Broker of Record)

    c.    **Ownership Transfer**. The written consent of GMAC Real Estate shall be required with respect to any Transfer. Each of the following transfers of an ownership interest equal to or greater than 10% of the total ownership interests in Strategic-Partner (including transfers which, over a period of 2 years, each individually involve less than 10% of the ownership interests, but cumulatively, equal or exceed a transfer of 10% or more of the ownership interests) shall constitute a "**Transfer**": (i) those occurring involuntarily or by operation of law, including those resulting from death, marriage, incompetency or similar events; (ii) those occurring through merger, acquisition, consolidation, dissolution, bankruptcy, execution or foreclosure sale or similar events or those occurring between/among the spouse and/or children of an Owner; (iii) those occurring through any other voluntary act of a party. As to a Transfer described in this subsection 17.c.(i), above, within 60 days prior to the occurrence of the event (but, in the case of death, within 30 days after the date of such death), Strategic-Partner or transferee shall notify GMAC Real Estate, in writing, of the proposed Transfer and the transferee shall agree to accept an assignment and assumption of the Agreement; thereafter, GMAC Real Estate, within 60 days of its receipt of the notification, shall notify Strategic-Partner or transferee of its consent or refusal to consent (GMAC Real Estate shall not unreasonably withhold, delay or condition its consent). As to a Transfer described in this subsection 17.c.(ii) or 17.c.(iii), above, within 60 days prior to the event, Strategic-Partner or transferee shall notify GMAC Real Estate, in writing, and GMAC Real Estate, within 60 days of its receipt of the notification, shall notify Strategic-Partner or transferee of its consent or refusal to consent (GMAC Real Estate shall have the right, within its sole discretion, to refuse to consent, in the event that the transferee refuses (or is unable to qualify) to accept an assignment and assumption

of Strategic-Partner's obligations under this Agreement, as provided in subsection 17.a., above). In the event of a Transfer of an ownership interest in Strategic-Partner, consent for which is not obtained as provided in this Section 17, both Strategic-Partner and the transferee shall be required to comply with the provisions of this Agreement and shall be obligated to GMAC Real Estate to do so. A failure to comply with the provisions of this Section 17 shall constitute an Event of Default under this Agreement.

     d.    **Right of First Refusal**. As to a Transfer (except the type of Transfer referenced in Section 17.c.(i), above, or a Transfer between/among the spouse and/or children of an Owner or between/among Owners), GMAC Real Estate shall have the right, at its option, to purchase (or otherwise have transferred to it) the stock and/or assets of Strategic-Partner, under substantially the same conditions as a proposed Transfer to a third-party (the "**Right of First Refusal**"). Prior to a Transfer to a third-party, Strategic-Partner shall serve upon GMAC Real Estate a copy of the contract (the "**Contract**") whereby Strategic-Partner has agreed with a third-party to a Transfer, together with a certification from each Owner that the Contract accurately and fully represents all the terms and conditions of the proposed Transfer and a copy of all due diligence materials furnished by Strategic-Partner to the third-party upon which the third-party based its offer as provided in the Contract. If, within 30 days of receipt by GMAC Real Estate of the above documentation (the "**30-day Notice Period**"), GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected to exercise its Right of First Refusal, GMAC Real Estate and Strategic-Partner shall be deemed to have entered into the Contract and, thereafter, each party shall be bound by its terms, provided the Contract provides (and, shall be deemed to so provide, if it does not), that: (i) GMAC Real Estate shall have the right to substitute cash for any other form of payment provided in the Contract; and (ii) the date of closing or settlement shall be not less than 60 days from the date of service by GMAC Real Estate upon Strategic-Partner of the notice that it has elected to exercise its Right of First Refusal; and (iii) Strategic-Partner makes the customary warranties and representations given by the seller of the assets of, or ownership interests in, an entity operating a real estate brokerage business, including, but not limited to, those related to title, the operating condition of the assets, the validity of contracts and the extent of liabilities. If, within the 30-day Notice Period, GMAC Real Estate (or one of its Affiliates) serves upon Strategic-Partner a notice that it has elected not to exercise its Right of First Refusal or if no notice is so served by GMAC Real Estate, GMAC Real Estate shall be deemed to have waived its Right of First Refusal for a period of 180 days from the beginning of the 30-day Notice Period (the "**180-day Waiver Period**"). If, within the 180-day Waiver Period, Strategic-Partner effectuates the Transfer in accordance with the terms and conditions of the Contract, the Right of First Refusal shall be considered terminated. If, within the 180-day Waiver Period, the Transfer is not effectuated in accordance with the terms and conditions of the Contract or any material term or condition of the Contract is changed, the Right of First Refusal shall be considered reinstated and the procedures set forth above shall be followed with respect to any proposed Transfer (including a proposed Transfer which was the subject of a Contract that was changed during any 180-day Waiver Period).

## 18.    TERMINATION.

     This Agreement may be terminated upon any one of the following conditions (in addition to the conditions specifically mentioned elsewhere in this Agreement and unless otherwise provided by the law of the state in which Strategic-Partner is located). Prior to the effective date

of termination, Strategic-Partner shall pay all monies due, or to become due pursuant to this Agreement, to GMAC Real Estate and shall furnish GMAC Real Estate with all required reports and records. After termination, GMAC Real Estate shall have no further obligations to Strategic-Partner.

a. **By Strategic-Partner.** If GMAC Real Estate is in Default (as defined in Subsection d. below) of this Agreement, Strategic-Partner may terminate this Agreement, effective upon service upon GMAC Real Estate of a written notice of termination (the **"Strategic-Partner's Termination Notice"**), provided, prior to the service of Strategic-Partner's Termination Notice, Strategic-Partner had served upon GMAC Real Estate a written notice of such Default (the **"Strategic-Partner's Default Notice"**) which specified the nature and extent of the Default, including identification of the specific provision of this Agreement which GMAC Real Estate is in Default of, and GMAC Real Estate failed to cure such Default within 30 days after receipt of Strategic-Partner's Default Notice or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, GMAC Real Estate failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by GMAC Real Estate within 90 days of the service of the Strategic-Partner's Default Notice, despite the diligent efforts of GMAC Real Estate to do so, Strategic-Partner shall have the right to serve Strategic-Partner's Termination Notice at any time thereafter, until the Default is cured).

The service of Strategic-Partner's Termination Notice by Strategic-Partner shall: (1) be deemed to be an irrevocable waiver by Strategic-Partner of the exclusivity of the Licensed Site(s) and GMAC Real Estate shall be free to license other parties to use the Marks at the Licensed Site(s), and (2) relieve other strategic-partners of the Franchise of any obligations regarding the placement of referrals with Strategic-Partner.

b. **By GMAC Real Estate (Automatic).** Each of the following shall constitute an Event of Default, which, among other things, shall result in an automatic termination of this Agreement (unless GMAC Real Estate, in its sole discretion, notifies Strategic-Partner, in writing to the contrary), effective immediately, without notice to Strategic-Partner:

(1) Strategic-Partner becomes insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy (or similar proceeding) is filed by Strategic-Partner or is filed against Strategic-Partner and is not opposed by Strategic-Partner; or if a final judgment in an amount of $25,000 or more is entered against Strategic-Partner and is not covered by a policy of insurance remains unsatisfied for a period of 60 days; or, if Strategic-Partner is an individual and except as otherwise provided in this Agreement, Strategic-Partner dies, or, if Strategic-Partner is an entity, Strategic-Partner ceases to exist; or if execution is levied against Strategic-Partner or Strategic-Partner's business, assets, ownership interest or property.

(2) Strategic-Partner ceases to operate its real estate brokerage business, which shall include failing to keep its offices open and staffed during all regular business hours, properly equipped for the transaction of real estate brokerage activities; provided, however, that if Strategic-Partner's business premises are damaged or destroyed, Strategic-Partner shall have 30 days after such event in which to apply for approval from

GMAC Real Estate to relocate or reconstruct the premises, which approval shall not be unreasonably withheld, delayed or conditioned. Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any cessation of its real estate brokerage business or the closure of any of its offices;

(3)     The real estate brokerage license of Strategic-Partner, of Strategic-Partner's broker of record (or the equivalent) or of any Owner is suspended, revoked or not renewed, or Strategic-Partner's right to do business in the jurisdiction in which any of Strategic-Partner's Licensed Sites is located. Strategic-Partner shall notify GMAC Real Estate, in writing, immediately upon the occurrence of any of the above events;

(4)     Strategic-Partner or any Owner conducts its real estate brokerage operations in such a fashion as to reflect unfavorably on GMAC Real Estate, its name, goodwill or reputation, or on the Marks, including, but not limited to, the employment of or other association with any individuals who have been convicted of a crime; or Strategic-Partner acts or fails to act in such a manner as to be in violation of any law or regulation.     Without limiting the generality of the foregoing, any breach of the representations or warranties set forth in Section 20(c) hereof shall result in automatic termination of this Agreement.     Strategic-Partner shall notify GMAC Real Estate immediately upon the occurrence of any of the above events;

(5)     Strategic-Partner or any Owner purports to transfer any rights or obligations under this Agreement or any interest in Strategic-Partner to a third party without GMAC Real Estate's prior written consent, contrary to the provisions of this Agreement;

(6)     Strategic-Partner or any Owner makes any material misrepresentation or omission in its application or Business and Financial History Form or Strategic-Partner maintains false books or records or makes any false reports or statements to GMAC Real Estate; or

(7)     Strategic-Partner or any Owner is in Default of any provision of this Agreement and was served with a GMAC Real Estate Default Notice (as defined below) in the preceding 12-month period.

c.     **By GMAC Real Estate (Right To Cure)**. If Strategic-Partner or any Owner is in Default of this Agreement based on acts or omissions not referenced in subsection 18.b., above, GMAC Real Estate, in addition to all other remedies available to it, may terminate this Agreement, effective upon service upon Strategic-Partner of a written notice of termination (the **"GMAC Real Estate Termination Notice"**), provided, prior to the service of the GMAC Real Estate Termination Notice, GMAC Real Estate had served upon Strategic-Partner a written notice of such Default (the **"GMAC Real Estate Default Notice"**) which specified the nature and extent of the Default and Strategic-Partner failed to cure such Default within 30 days after receipt of the GMAC Real Estate Default Notice, or, if the Default is one which could not reasonably have been expected to have been cured within that 30-day period, Strategic-Partner failed to diligently pursue the curing of the Default within that 30-day period (if the Default has not been cured by Strategic-Partner within 90 days of the service of the GMAC Real Estate

Default Notice, despite the diligent efforts of Strategic-Partner to do so, GMAC Real Estate shall have the right to serve a GMAC Real Estate Termination Notice at any time thereafter, until the Default is cured).

     **d.**    **Default and Event of Default.** The term "**Default**", as used throughout this Agreement, shall mean a material failure to comply with a provision of this Agreement. The term "**Event of Default**", as used throughout this Agreement, shall mean a Default for which this Agreement provides no period to cure or for which the period to cure has expired.

## 19. OBLIGATIONS UPON TERMINATION.

    a.    Upon termination of this Agreement, for whatever reason, Strategic-Partner shall:

      (1)    within 10 days of such termination, discontinue use of all Marks, including the words "GMAC Real Estate", or any derivation of those words, and refrain from holding itself out to the public in a manner that would suggest that it is a licensee or former licensee of GMAC Real Estate. Strategic-Partner agrees that GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of the Marks;

      (2)    on the date of such termination, pay to GMAC Real Estate all fees, charges and other amounts due to GMAC Real Estate, together with the following additional fees:

          (a)    Franchise Fees and Advertising Fees, computed as set forth on Exhibit A, on GCI attributable to transactions in process on the termination date and to anticipated closings emanating from listings entered into by Strategic-Partner prior to the termination date; and

          (b)    Referral Fees, computed as set forth above, on referrals sent or received prior to the termination date;

      (3)    Surrender to GMAC Real Estate or, at the option of GMAC Real Estate, destroy all signs and documentation bearing the Marks, including yard signs, letterheads, advertising and marketing materials, business cards, manuals, training materials, client promotion materials and the like. GMAC Real Estate shall have the right to secure an order enjoining Strategic-Partner from any use of materials or programs which are part of the Franchise;

      (4)    Take immediate steps to cancel all advertising, including advertising in the Yellow Pages of the telephone directory, which carries the Marks; and

      (5)    Execute any documents necessary to effectuate its obligations under this Agreement and take such action as GMAC Real Estate deems reasonably necessary to evidence the fact that Strategic-Partner has ceased using the Marks and has no further right to use the Marks.

b.     Upon termination of this Agreement pursuant to Section 18.b. or 18.c. above, in addition to the obligations set forth in subsection 19.a. above:

(1)     Strategic-Partner shall:

(a)     pay to GMAC Real Estate all financial losses sustained by GMAC Real Estate as the result of the early termination (if the amount of such losses cannot be calculated exactly, they shall be estimated); and

(b)     remain obligated with respect to the provisions of Section 8 of this Agreement; and

(2)     Owners shall be personally liable to GMAC Real Estate for all financial obligations of Strategic-Partner to GMAC Real Estate, but limited to those obligations incurred prior to the date of termination and those based on losses attributable to the one-year period after the date of termination.

c.     If, after termination of this Agreement, Strategic-Partner fails to comply with its obligations under this Section, in addition to any other payments required to be made by Strategic-Partner to GMAC Real Estate, Strategic-Partner shall reimburse GMAC Real Estate for all its costs related to its attempt to enforce its rights, including the payment of reasonable collection agency's fees, attorney's fees and costs.

## 20.     REPRESENTATIONS AND WARRANTIES.

a.     Strategic-Partner represents that it is either an individual or an entity (properly formed and authorized to do business in the state in which the Licensed Site(s) is/are located) licensed to sell real estate in the state in which the Licensed Site(s) is/are located.

b.     Strategic-Partner acknowledges that GMAC Real Estate has delivered to Strategic-Partner, not less than 10 business days prior to the signing of this Agreement, a copy of the Offering Circular concerning this franchise for each state in which the Licensed Site(s) is/are located and in which Strategic-Partner intends to do business, which Strategic-Partner has had an opportunity to review.  Strategic-Partner further acknowledges that GMAC Real Estate has not, either orally or in writing, represented that Strategic-Partner will achieve in the licensed business any specified level of sales or profit, nor represented the sales or profit level of any other licensee, but has referred Strategic-Partner to the Offering Circular which provides Strategic-Partner with the names, addresses and telephone numbers of other licensees of GMAC Real Estate, so that Strategic-Partner can make its own inquiry.     Strategic-Partner further acknowledges that any additional inquiry pertaining to the nature of this franchise which Strategic-Partner has made to GMAC Real Estate, in writing, has been answered, in writing, to the satisfaction of Strategic-Partner.

c.     Strategic-Partner acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the government of the United States has adopted and may in the future adopt other anti-terrorism measures (the "Anti-Terrorism Measures").  GMAC Real Estate therefore requires certain representations and warranties that the parties with

whom it deals are not directly or indirectly involved in terrorism. Therefore, Strategic-Partner hereby represents and warrants that neither it nor any of its employees, agents, representatives or, as applicable, its principals, members, officers or directors, nor any other person or entity associated with Strategic-Partner (each, individually, a "Strategic-Partner Party" and collectively, the "Strategic-Partner Parties") is:

      (i)     a person or entity listed in the Annex to the Executive Order; or

      (ii)    a person or entity otherwise determined pursuant to the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism (such a person or entity and those persons and entities listed in the Annex to the Executive Order are referred to herein as "Terrorists"); or

      (iii)   a person or entity who assists, sponsors or who supports Terrorists or acts of terrorism ("Sponsors of Terrorism"); or

      (iv)   owned or controlled by Terrorists or Sponsors of Terrorism.

Furthermore, Strategic-Partner represents and warrants that neither it nor any Strategic-Partner Party will, during the term of this Agreement, become a person or entity described in subsections (i) – (iv) above.

## 21.  ENTIRE AGREEMENT.

This Agreement is the entire agreement of the parties and supersedes any and all prior oral or written agreements or understandings between the parties relating to the subject matter of this Agreement.

## 22.  INDEMNIFICATION AND INSURANCE.

Strategic-Partner shall defend, indemnify and hold harmless GMAC Real Estate, its shareholder, agents and employees, from and against any claims for damages, losses and expenses (including attorney's fees) resulting in any way from the conduct of Strategic-Partner's real estate brokerage business. This indemnification obligation shall survive the expiration or earlier termination of this Agreement.

In addition to, and not in substitution for, the above indemnification, Strategic-Partner shall, at its own expense, purchase and maintain: (a) comprehensive general liability insurance, including contractual, products/completed operations and personal injury coverage; (b) comprehensive automobile liability coverage, including owned, non-owned and hired automobiles used in Strategic-Partner's real estate brokerage operations; (c) errors and omissions insurance, with respect to Strategic-Partner's real estate brokerage operations. For the insurance referenced under subsections (a) and (b) above, the minimum limits required shall be $1,000,000 per occurrence for bodily injury and $500,000 per occurrence for property damage, with a maximum deduction of $5,000; for the insurance referenced in subsection (c) above, the minimum limits shall be $1,000,000 per annum, with a maximum deduction of $5,000. GMAC Real Estate shall be named as an additional insured on each such policy. Workers Compensation insurance, to the extent required by the law of each state in which each Licensed Site (or

exclusive Territory, if applicable) is located, shall be purchased and maintained by Strategic-Partner on each employee and sales associate. All losses resulting from Strategic-Partner's failure to obtain insurance shall be borne by Strategic-Partner, only. In the event of cancellation, non-renewal or material change in Strategic-Partner's required insurance policies, Strategic-Partner shall serve upon GMAC Real Estate a notice of such action at least 30 days prior to the effective date of such action. Strategic-Partner shall deliver to GMAC Real Estate a copy of its insurance binder before the Effective Date and, thereafter, shall serve upon GMAC Real Estate continuous certificates of such coverages (which certificates shall provide that the applicable policies shall not be cancelled without serving upon GMAC Real Estate at least 30-days prior notification of such intended cancellation).

23.    **CHOICE OF LAW AND FORUM; ARBITRATION; WAIVER OF JURY TRIAL; TIME LIMITATION FOR CLAIMS.**

    a.    This Agreement shall be construed in accordance with the laws of the state in which the Licensed Site(s) is/are located. If Licensed Sites are located in more than one state, this Agreement shall be construed in accordance with the laws of the state in which Strategic-Partner has been formed or, if Strategic-Partner is not an entity, the state in which Strategic-Partner's principal administrative office is located. However, no law regulating the offer or sale of franchises, business opportunities or similar interests or governing the relationship between GMAC Real Estate and Strategic-Partner will apply unless its jurisdictional requirements are met independently without reference to this Subsection.

    b.    Any Dispute with respect to this Agreement, or the relationship of the parties or the rights or obligations of the parties arising from, or in connection with, this Agreement, shall be decided by binding arbitration (the term **"Dispute"** shall be given its broadest meaning and shall include, but not be limited to, disagreements with respect to the legality, enforceability or interpretation of this Agreement or any provision of this Agreement, or with respect to whether a party has fulfilled its obligations under this Agreement or with respect to the relationship of the parties) and shall be the exclusive means of enforcing a party's rights under this Agreement, including those rights that would otherwise be enforceable through the institution of class-action or similar litigation. Notwithstanding the above, GMAC Real Estate may seek to enforce, through litigation, its rights that require the entry of injunctive or similar relief, as determined by the court to which an application for such relief is made. In the event the parties are unable to agree otherwise, arbitration shall be conducted through the American Arbitration Association, in accordance with its policies and procedures related to commercial arbitrations. All arbitrations shall be conducted in the State of Illinois.

    c.    **To the extent permitted by law, Strategic-Partner and GMAC Real Estate each waives its right to a trial by jury in any litigation or arbitration proceeding arising from this Agreement or from actions taken pursuant to this Agreement or from the relationship between the parties resulting from this Agreement.**

    d.    Any claim by Strategic-Partner against GMAC Real Estate shall be barred unless, within one year from the date that Strategic-Partner knew, or should have known, of the facts upon which the claim is based, Strategic-Partner filed a formal request for arbitration against GMAC Real Estate, as set forth above.

**24.  MODIFICATION OF AGREEMENT.**

Subject to GMAC Real Estate's right to modify its standards and specifications for use of the Marks and other aspects of the operation of a GMAC Real Estate business, no changes may be made in this Agreement unless in writing and signed by all parties.

**25.  SEVERABILITY.**

Each Section and provision of this Agreement is severable and, if one portion is invalid, the remaining portions shall nevertheless remain in full force and effect.

**26.  NON-WAIVER.**

No failure by GMAC Real Estate to take action on any Default or Event of Default of Strategic-Partner, whether it is a single instance or a series of instances, shall constitute a waiver of such Default or Event of Default or of the performance required of Strategic-Partner. No express waiver by GMAC Real Estate of any performance or Default or Event of Default of Strategic-Partner shall be construed as a waiver of any other or any future obligation or Default or Event of Default.

**27.  NOTICES.**

Any notice provided for in this Agreement shall be in writing, addressed to GMAC Real Estate or Strategic-Partner at the respective addresses set forth at the beginning of this Agreement, and shall be served: (a) by personal delivery (which shall be effective upon such personal delivery) or (b) by certified mail, return receipt requested, properly addressed, postage prepaid (which shall be effective on the earlier of the date of delivery as indicated on the return receipt card or 3 days after deposit into the United States mails, or (c) by a nationally recognized overnight delivery service, properly addressed, delivery charges prepaid (which shall be effective on the earlier of the date of delivery as indicated on the carrier's receipt records or 2 days after delivery to the carrier).

**28.  TERM AND RENEWAL.**

The term of this Agreement shall be ten (10) years from the Effective Date (as later defined) (the "**Term**").

At the expiration of the Term, Strategic-Partner shall have the right to enter into a new agreement with GMAC Real Estate, subject to the following conditions: (a) Strategic-Partner has provided GMAC Real Estate with written notice of its intent to execute a new agreement at least 180 days prior to the expiration of the Term, and (b) Strategic-Partner is not then and has not been in Default of this Agreement. The new agreement will be in the form then being offered by GMAC Real Estate. The new agreement may contain materially different terms than this Agreement, including those which relate to fees, payment of fees, performance standards, renewal terms and the Marks.

Subject to any contrary applicable state law, if Strategic-Partner continues to use the Marks after the end of the Term, but fails to execute a new agreement, Strategic-Partner will be

deemed to be operating under the terms and conditions of the agreement then being offered by GMAC Real Estate, except that the term shall be deemed to be 180 days from the date that GMAC Real Estate is served with a notice of termination by Strategic-Partner (at its option, GMAC Real Estate shall have the right to shorten the term by the service upon Strategic-Partner of a notice fixing a shorter term) and, at the option of GMAC Real Estate but without notice being required, the Franchise Fees shall be increased to an amount equal to 10% of Strategic-Partner's monthly GCI, payable within 48 hours of the completion of each settlement and closing from which Strategic-Partner is entitled to be paid a commission.

**29.    EFFECTIVE DATE.**

The parties intend that this Agreement be effective as of August 1, 2003 (the "**Effective Date**").

**30.    LIMITATION OF DAMAGES.**

Except for Strategic-Partner's obligation to indemnify GMAC Real Estate, as provided by common law or in the Section of this Agreement entitled "Indemnification and Insurance", neither party shall be liable to the other for consequential, punitive or exemplary damages.

**[The remainder of this page has been intentionally left blank.]**

Jul 31 03 10:00a     GMACHS                    630-954-2716           p.4
   07/31/03  10:55 FAX 908 542 5452        SP RELOCATION SVCS                      @003

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

**GMAC REAL ESTATE, LLC**

By: _____

Print Name: ~~Judith O'Brien~~ S.W. PHILLIPS

Title: ~~Vice President~~ E.V.P.

Date: **07.31.03**

By: David Gull Chung

Print Name: David Inki Chung

Title: Partner

Date: 7/24/03

By: _____

Print Name: Kwung Ho Yang

Title: Partner

Date: 7/24/03

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

**GMAC REAL ESTATE, LLC**

By:_____

Print Name: Judith O'Brien

Title: Vice President

Date:_____

By: _David Julin Chung_

Print Name: David Inki Chung

Title: Partner

Date: 7/24/03

By:_____

Print Name: Kwung Ho Yang

Title: Partner

Date: 7/24/03

## Exhibit A to the Franchise Agreement
## Franchise and Advertising Fees (Flat Fees per Agent)

**a.     Franchise Fees.**

Strategic-Partner shall pay to GMAC Real Estate, Franchise Fees, in accordance with the following:

(1)     On the 5th day of each calendar-month, for each full or partial calendar month covered by this Agreement, an amount equal to $150, times the greater of (A) the number of sales agents or brokers licensed or associated with Strategic-Partner at any time during the second preceding calendar-month (e.g., the calculation for the payment due on the 5th of May would be based on the number of agents or brokers during the month of March) or (B) twenty-five (25) (the **"Base Agent Number"**); and

(2)     Within 10 days of the end of each calendar year, an amount equal to $300, times the greater of (A) the greatest number of sales agents or brokers licensed or associated with Strategic-Partner at any one time during the preceding calendar-year or (B) the Base Agent Number.

**b.     Advertising Fees.**

Strategic-Partner shall pay to GMAC Real Estate, on the 5th day of each calendar-month, for each full or partial calendar-month covered by this Agreement, an Advertising Fee in an amount equal to $25, times the number of sales agents or brokers licensed or associated with Strategic-Partner at any time during the second preceding calendar-month (e.g., the calculation for the payment due on the 5th of May would be based on the number of agents or brokers during the month of March) or (B) twenty-five (25) (the **"Base Agent Number"**).

**c.     Cost of Living Adjustments**

Franchise and Advertising Fees may be increased at the beginning of each calendar-year, at the sole discretion of GMAC Real Estate, by a percentage comparable to the percentage increase in the cost-of-living index during the prior calendar-year (but in no event shall the percentage increase in the Fees in any year be greater than 5%). The cost-of-living index shall be the Consumer Price Index for Urban Wage Earners and Clerical Workers (United States City Average, All Items), published by the United States Department of Labor (Bureau of Labor Statistics) (or a comparable index, if this index is no longer being published).

A-3-1

## ENDORSEMENT OF PRINCIPALS / OWNERSHIP INTEREST HOLDERS

Each of the Owners identified in Section 17.b. is executing this Agreement for the limited purpose of being personally bound by the provisions of Sections 3 (The Marks), 4 (Materials), 8 (No Conflicting License/Interest), 13 (Verification Rights), 17 (Assignment and Ownership; Ownership Transfer; Right of First Refusal) and 19.b. (Financial Obligations after Default) of this Agreement.

_____     Date: __7/24/03__
David Inki Chung

_____     Date: __7/24/03__
Kwung Ho Yang


EXHIBIT
B

## FRANCHISE DEVELOPMENT COSTS NOTE

<u>Up to $50,000</u>                                                <u>as of August 1, 2003</u>

For Value Received, David Inki Chung and Kwung Ho Yang, partners, jointly and severally, ("**Company**" or "**Member**"), promises to pay to the order of GMAC Real Estate, LLC ("**GMAC Real Estate**" or "**Lender**"), at its office at 2021 Spring Road, Suite 300, Oak Brook, IL 60523, or at such other place as the holder of this Note may from time to time direct, the principal sum of up to Fifty Thousand and 00/100 Dollars ($50,000) or so much of that amount as has been borrowed by the Company from the Lender pursuant to the Development Loan and Security Agreement executed simultaneously with this Note (the "**Principal Loan Amount**"), together with interest thereon, as follows:

**Payments.** Payments shall be made in monthly amounts on the first day of the month following the Effective Date and each first day of each month thereafter for a total of 120 months, with all outstanding Principal and interest being payable, in full, on the 1st day of the 120th month (the "**Date of Final Payment**"). Each monthly payment shall be in an amount equal to (a) the Principal Loan Amount outstanding, multiplied by a percentage, the numerator of which is 1 and the denominator of which is the number of months remaining until the Date of Final Payment, and (b) all accumulated interest.

**Interest Rate.** The Interest Rate, as to each monthly interest payment, shall be the interest rate published in the Wall Street Journal (the "**WSJ**") on the 1st business day of each such month, as the prime or base lending rate (if such interest rate is not so published in the WSJ, the Interest Rate shall be the average prime or base lending rate, as of that date, being offered by the three largest United States banks), plus 2%.

**Principal Reductions.** Notwithstanding any other provision of this Note, so long as Member is not in default under the franchise agreement (the "**Franchise Agreement**") entered into between the Member and GMAC Real Estate (including all Amendments) and so long as an Event of Default (as defined below) under this Note has not occurred, Member shall not be required to pay to GMAC Real Estate the monthly amounts of principal and interest set forth above and the principal due on this Note shall be deemed reduced by an amount equal to each such monthly principal payment which is not required to be made.

**Events of Default.** An event of default (an "**Event of Default**") under this Note shall be as provided in the Development Loan and Security Agreement. Upon the occurrence of an Event of Default, all amounts unpaid under this Note shall immediately become due and payable.

**Member's Waiver.** The Member waives presentment, demand and protest and notice of presentment, protest, default, non-payment or maturity.

**Jurisdiction.** All litigation with respect to this Note or with respect to actions taken pursuant to this Note shall be conducted in the Courts located in the State of Illinois.



EXHIBIT

C

**Waiver of Jury Trial.** *THE MEMBER WAIVES ALL RIGHT TO A JURY IN ANY LITIGATION WITH RESPECT TO THIS NOTE OR ACTIONS TAKEN PURSUANT TO THIS NOTE.*

**Member:**

By: _David Guillo Chung_
    David Inki Chung

By: _____
    Kwung Ho Yang

[The remainder of this document has been intentionally left blank]

## Personal Guaranty of Note

Name of Guarantor: David Inki Chung
Name and Address of Strategic-Partner: David Inki Chung & Kwung Ho Yang, Partners
4282 Wilshire Blvd., #200, Los Angeles, CA 90010
Loan Amount: Up to $50,000.00
Type of Note: Franchise Development Costs                    ("Note")

In consideration of the loan (the **"Loan"**) extended by GMAC Real Estate, LLC or its
Affiliate or designee (together or separately, **"Lender"**) to Strategic-Partner in the Loan
Amount and as evidenced by the Note, as set forth above, the undersigned Guarantor who
is a principal of Strategic-Partner and who will receive a benefit from the granting of the
Loan to Strategic-Partner, unconditionally and continually guarantees payment of the
Loan to Lender, together with all costs (including attorney's fees) necessary to collect the
Loan or enforce this Guaranty, and unconditionally guarantees the fulfillment by
Strategic-Partner of all obligations undertaken by Strategic-Partner pursuant to the Note
and the other documents executed in connection with the Loan and the Note, including
the Loan and Security Agreement. Guarantor's liability shall be joint and several with all
other guarantors of the Loan. Any indebtedness from Strategic-Partner to Guarantor is
subordinated to the indebtedness from Strategic-Partner to Lender.

In the event Strategic-Partner defaults with respect to the Loan, Lender shall not be
required to first proceed against Strategic-Partner or against any collateral held by Lender
before seeking to collect the balance due under the Loan from Guarantor. This Guaranty
contains all agreements and understandings between the parties relating to Guarantor's
obligations with respect to the Loan.

**TO THE EXTENT PERMITTED BY LAW, GUARANTOR WAIVES
GUARANTOR'S RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY
ISSUES RELATED TO THIS GUARANTY.**

_David Inki Chung_ , individually
David Inki Chung

Dated: 7/24/03

EXHIBIT
D

### Personal Guaranty of Note

Name of Guarantor: <u>Kwung Ho Yang</u>
Name and Address of Strategic-Partner: <u>David Inki Chun and Kwung Ho Yang, Parnters</u>
<u>4282 Wilshire Blvd., #200, Los Angeles, CA 90010</u>
Loan Amount: <u>Up to $50,000.00</u>
Type of Note: <u>Franchise Development Costs</u>                    ("**Note**")

In consideration of the loan (the "**Loan**") extended by GMAC Real Estate, LLC or its
Affiliate or designee (together or separately, "**Lender**") to Strategic-Partner in the Loan
Amount and as evidenced by the Note, as set forth above, the undersigned Guarantor who
is a principal of Strategic-Partner and who will receive a benefit from the granting of the
Loan to Strategic-Partner, unconditionally and continually guarantees payment of the
Loan to Lender, together with all costs (including attorney's fees) necessary to collect the
Loan or enforce this Guaranty, and unconditionally guarantees the fulfillment by
Strategic-Partner of all obligations undertaken by Strategic-Partner pursuant to the Note
and the other documents executed in connection with the Loan and the Note, including
the Loan and Security Agreement.  Guarantor's liability shall be joint and several with all
other guarantors of the Loan.  Any indebtedness from Strategic-Partner to Guarantor is
subordinated to the indebtedness from Strategic-Partner to Lender.

In the event Strategic-Partner defaults with respect to the Loan, Lender shall not be
required to first proceed against Strategic-Partner or against any collateral held by Lender
before seeking to collect the balance due under the Loan from Guarantor.  This Guaranty
contains all agreements and understandings between the parties relating to Guarantor's
obligations with respect to the Loan.

**TO THE EXTENT PERMITTED BY LAW, GUARANTOR WAIVES
GUARANTOR'S RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY
ISSUES RELATED TO THIS GUARANTY.**

_____, individually
Kwong Ho Yang

Dated: __7 - 24 - 03__

### Personal Guaranty of Note

Name of Guarantor: Hyun Chung

Name and Address of Strategic-Partner: David Inki Chung and Kwung Ho Yang,Partners

4282 Wilshire Blvd., #200, Los Angeles, CA 90010

Loan Amount: Up to $50,000.00

Type of Note: Franchise Development Costs                    ("Note")

In consideration of the loan (the "**Loan**") extended by GMAC Real Estate, LLC or its Affiliate or designee (together or separately, "**Lender**") to Strategic-Partner in the Loan Amount and as evidenced by the Note, as set forth above, the undersigned Guarantor who is the wife of a principal of Strategic-Partner and who will receive a benefit from the granting of the Loan to Strategic-Partner, unconditionally and continually guarantees payment of the Loan to Lender, together with all costs (including attorney's fees) necessary to collect the Loan or enforce this Guaranty, and unconditionally guarantees the fulfillment by Strategic-Partner of all obligations undertaken by Strategic-Partner pursuant to the Note and the other documents executed in connection with the Loan and the Note, including the Loan and Security Agreement. Guarantor's liability shall be joint and several with all other guarantors of the Loan. Any indebtedness from Strategic-Partner to Guarantor is subordinated to the indebtedness from Strategic-Partner to Lender.

In the event Strategic-Partner defaults with respect to the Loan, Lender shall not be required to first proceed against Strategic-Partner or against any collateral held by Lender before seeking to collect the balance due under the Loan from Guarantor. This Guaranty contains all agreements and understandings between the parties relating to Guarantor's obligations with respect to the Loan.

**TO THE EXTENT PERMITTED BY LAW, GUARANTOR WAIVES GUARANTOR'S RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY ISSUES RELATED TO THIS GUARANTY.**

_Hyun Sook Chung_, individually
Hyun Chung

Dated: 7/24/03